**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

THERESA McCULLEY,            )
                                      )
         Plaintiff,        )
                                      )     No. 13 C 6031
    v.                          )
                                      )     Judge Sara L. Ellis
NANCY A. BERRYHILL, Deputy    )
Commissioner of Operations, Social Security   )
Administration,[1]           )
                                      )
         Defendant.     )

## OPINION AND ORDER

Plaintiff Theresa McCulley seeks to overturn the final decision of the Commissioner of

Social Security (the "Commissioner") denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and supplemental

security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381a.  Before

the Court are the parties' cross-motions for summary judgment.  Because the Administrative

Law Judge ("ALJ") erred by failing to consider her mental limitations in his residual functional

capacity ("RFC") finding and in rendering his credibility determination, including by

inappropriately discounting her hand limitations, the Court reverses the ALJ's decision and

remands this case to the Social Security Administration for further proceedings consistent with

this Opinion.

---

[1] The Court substitutes Nancy A. Berryhill for Carolyn W. Colvin as the proper defendant in this action.
Fed. R. Civ. P. 25(d).

# BACKGROUND

## I.    Medical History

McCulley is 5'1" and weighs 189 pounds.  AR 67.  In her initial application for DIB and SSI, McCulley stated that she could not sit for more than 30 minutes or stand for more than 10 to 20 minutes.  AR 204.  If she sat for 2 hours, she had to elevate her legs.  AR 214.  McCulley reported that she had to rest for 30 minutes to 2 hours at a time several times a day and that she was not mobile for any consistent period of time.  AR 204.  McCulley noted that activities like using a pen or pencil caused cramping and spasms in her hands and fingers after 15 to 20 minutes of continuous use.  AR 213.

McCulley reportedly had a C3-C4 fusion in 2001.  AR 295.  On July 20 and again on August 16, 2005, McCulley received steroid injections at the L4-L5 level to address back pain and spinal stenosis of the lumbar spine.  AR 245, 247.  On August 27, 2005, physicians admitted her to Mercy Hospital with complaints of abdominal pain and diagnosed her with complicated acute diverticulitis, hypertension, and gastroesophageal reflux disease ("GERD").  AR 249–50.  Mercy Hospital discharged her on August 31, 2005.  AR 251.  McCulley again received a steroid injection at the L4-L5 level on October 19, 2006, AR 252, and then at the L5-S1 level on December 13, 2006, AR 256.  A colonoscopy on May 14, 2010 revealed severe diverticulosis.  AR 258.  A December 20, 2010 x-ray of McCulley's left foot indicated a hallux valgus deformity.  AR 265.

On July 18, 2011, McCulley complained to Dr. Barberousse, her treating physician, of dull aching constant pain in her hands, which had been going on for about a year, AR 366.  She reported that, after some activity, her fingers would cramp and lock, with the pain reaching a level of 10 out of 10.  AR 366.  McCulley said taking ibuprofen had little effect and that running

her hands under scalding hot water provided the only relief. AR 366. On November 22, 2011, an x-ray of her hands showed no fractures or dislocations and no significant joint or soft tissue abnormalities. AR 341. Dr. Barberousse's notes from McCulley's December 9, 2011 appointment did not mention these x-ray results. AR 360. But his notes from McCulley's subsequent February 27, 2012 appointment recount McCulley's complaints of joint pain in her hands, particularly in her right hand, including that she felt she could not pick up objects. AR 357. Although McCulley described pain going from her hand to the distal phalanges, she reportedly only took ibuprofen intermittently because she did not want to take medicine unless absolutely necessary. AR 357. Dr. Barberousse indicated in his notes that he would send her to a musculoskeletal clinic for an evaluation, AR 359, but there is no evidence in the record to indicate whether this evaluation occurred.

In addition to her physical problems, McCulley had mental health issues as well. On March 23, 2009, McCulley complained to Dr. Barberousse that she was depressed. AR 287. In response, Dr. Barberousse prescribed Zoloft. AR 287. On April 19, 2010, McCulley complained again of depression and he prescribed Wellbutrin, a medication she had previously taken for depression. AR 281. She continued on and off Wellbutrin throughout the course of her treatment under Dr. Barberousse, indicating that she did not take it at times because she did not like being on medication. AR 357, 363. On September 26, 2011, McCulley told Dr. Barberousse that she was considering seeking out a mental health provider to address her depression, AR 363, but there is no evidence in the record that she actually did so.

## II. Employment History

McCulley was born on January 30, 1955, and was 57 years old at the time of the ALJ's decision. AR 39, 67. She has a college degree. AR 40. Since 1984, McCulley performed

administrative clerical work for AT&T.  AR 41, 72.  McCulley testified that she was required to type for 80 to 85% of the day.  AR 51.  She stopped working on June 21, 2005, claiming she "couldn't function" with the back and leg problems she was experiencing.  AR 41.

## III.   Disability Claim and Hearing Testimony

On December 29, 2010, McCulley filed for DIB and SSI, alleging that she became disabled on June 21, 2005.  AR 67.  The agency denied her claims on April 15, 2011 and again on reconsideration on July 29, 2011.  AR 11.  McCulley requested a hearing, which was held on April 18, 2012 and at which McCulley had counsel.  AR 11.  Cheryl R. Hoiseth, a vocational expert, also testified at the hearing.  AR 11.

### A.   McCulley's Limitations and Activities

McCulley testified that she lived in a first floor apartment with her daughter.  AR 39.  She was able to drive, though she claimed not to drive often or for long distances.  AR 39–40.  McCulley further testified that her left leg was worse than her right and that she sometimes could not feel her toes.  AR 42.  She stated that she could not sit comfortably for more than a half hour and did not think she could lift more than 5 pounds.  AR 43.  She said she had problems with her hands, in that they were cramping and locking, and that she was experiencing muscle spasms and pains.  AR 49.  At home, McCulley's daughter took care of most of the household chores, although McCulley acknowledged that she did some lightweight chores, like washing the dishes and cooking small meals.  AR 46–47.  McCulley occasionally used a computer for email.  AR 48.  She did not socialize outside of the home much because she found other people's furniture uncomfortable.  AR 48.

## B. Medical Expert Evidence

On April 14, 2011, Dr. Clement A. Gotway, a state agency physician with the Bureau of Disability Determination Services ("DDS"), completed a physical RFC assessment. AR 73. Dr. Gotway found that McCulley could stand and/or walk with normal breaks for a total of 2 hours and sit with normal breaks for 6 hours in an 8-hour workday. AR 71. Dr. Gotway observed that McCulley was limited in her lower extremities and that although she could walk more than 50 feet unassisted, she tended to avoid complete weight bearing on her left leg when walking. AR 71. Dr. Gotway found that the "fine and gross manipulations of both hands were unimpaired." AR 71.

On April 6, 2011, Dr. Charles Carlton performed an internal medicine consultative examination for DDS. AR 312. He noted McCulley appeared to be a "reliable historian," and then recounted her history of lower back pain, left leg pain, numbness, and weakness, chronic neck pain, chronic hand pain, and ankle pain. AR 312–13. Dr. Carlton described McCulley's general appearance as "an obese individual in no acute distress" who was "able to rise from a sitting to a standing position without assistance" and could "walk greater than 50 feet without the use of assistive device," although he noted that she avoided placing weight on her left leg while walking. AR 313. Dr. Carlton found that she had normal grip strength bilaterally and that her fine and gross motor skills in each hand were normal. AR 314, 318. Dr. Carlton opined that McCulley could sit, walk further than 50 feet without an assistive device, handle objects with both hands, and perform tasks that involved lifting 10 to 20 pounds, though he acknowledged that McCulley had severe difficulty squatting. AR 315–16.

Dr. Charles Kenney, a second DDS doctor, performed a case analysis on July 27, 2011, finding that the initial medical evidence demonstrated that McCulley was able to function at a sedentary level. AR 86.

Dr. Barberousse completed a medical assessment on December 9, 2011. AR 324–26. He diagnosed McCulley with type 2 diabetes mellitus, chronic back pain due to multiple disc herniation, hypertension, depression, GERD, multiple joint pain, and dry eyes. AR 324. He noted that despite treatment, McCulley's joint pain and depression had worsened but thought that with appropriate intervention her conditions could improve. AR 324. He estimated that McCulley could only sit for 30 minutes uninterrupted and thus could not sit for 6 hours in an 8-hour workday. AR 325. Dr. Barberousse also estimated she could stand and walk only 20 minutes of an 8-hour workday. AR 325. He indicated that McCulley should keep her feet elevated 1 to 3 feet while sitting to relieve back pain and that she needed to lie down intermittently throughout the day. AR 325. He opined that McCulley could only lift and carry approximately 1 to 3 pounds occasionally. AR 325. In sum, Dr. Barberousse found that McCulley had marked limitations in her ability to complete a normal workday and workweek without interruptions from her symptoms and would need to take an unreasonable number of rest periods, leading to significant deficiencies in sustained concentration, persistence, and pace. AR 326.

### C. Vocational Expert Testimony

Cheryl Hoiseth, a vocational expert, testified that McCulley's prior job was similar to that of a customer service representative as defined by the Dictionary of Occupational Titles, which was sedentary work. AR 59. Hoiseth testified that a person with McCulley's limitations could perform the job of a customer service representative, even with a sit/stand option of 5 minutes

standing every hour.  AR 61–62.  She acknowledged that McCulley could not do that work if she was able to use her hands to type only occasionally, as the definition for customer service representative requires frequent typing.  AR 64–65.  She also indicated that a limitation in concentration and the need to elevate legs 1 to 3 feet would be job preclusive.  AR 65.

## IV.    The ALJ's Decision

On May 25, 2012, the ALJ found that McCulley is not disabled.  AR 11–21.  Following the five-step analysis used by the Social Security Administration to evaluate disability, the ALJ found at step one that McCulley had not engaged in substantial gainful activity since June 21, 2005, her alleged onset date, and so he proceeded to step two, where he found that McCulley's cervical disc disease, obesity, and chronic back pain constituted severe impairments.  AR 13. The ALJ also found McCulley had several non-severe impairments, including diabetes mellitus, hypertension, dermatitis, eczema, left foot deformity, and GERD, which did not impose more than minimal restrictions on her ability to perform basic work-related activities.  AR 13.  The ALJ further noted that McCulley's depressive disorder was non-severe because it did not cause more than minimal limitation on her ability to perform basic mental work activities, had only been treated sporadically with anti-depressants, and, according to McCulley's testimony, was under control.  AR 14.  The ALJ further evaluated the severity of McCulley's mental impairment using the four functional areas set forth in section 12.00C of the Listing of Impairments, i.e. the paragraph B criteria, and found that it caused her no limitation in three of the four areas and only a mild limitation in the fourth (concentration, persistence, or pace), causing it to be non-severe. AR 14–15.  Despite finding at step two that McCulley had several severe impairments, at step three the ALJ found that the severity did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart 4, Appendix 1.  AR 15–16.

7

After reviewing the record, the ALJ found that McCulley had the RFC to perform sedentary work, with the following restrictions: no climbing ladders, ropes, or scaffold; only occasionally climbing stairs, balancing, stooping, kneeling, crouching, and crawling; no more than occasional overhead reaching on both sides; and a sit/stand option to allow her to stand for 5 minutes every hour. AR 16. In reaching this conclusion, the ALJ found McCulley's testimony as to "the intensity, persistence and limiting effects of [her] symptoms . . . not entirely credible" and undermined by her treatment history. AR 17. The ALJ gave considerable weight to Dr. Carlton's, Dr. Gotway's, and Dr. Kenney's opinions that McCulley could perform some type of sedentary work and gave no weight to Dr. Barberousse's opinion that McCulley was functioning substantially below the sedentary level, finding his opinion "unreasonably restrictive and out of proportion to the medical evidence of record." AR 18–19. The ALJ added a sit/stand option to account for McCulley's testimony that she needed to alternate positions so as to relieve her pain. AR 19. Based on these findings and the RFC, the ALJ found at step four that McCulley was capable of performing her past work as a senior operations clerk, rendering a step five analysis unnecessary. AR 20–21. On that basis, the ALJ concluded that McCulley was not disabled and not entitled to benefits. AR 21.

The Appeals Council denied review on July 9, 2013, AR 1–3, making the ALJ's decision the final decision of the Commissioner. McCulley now seeks judicial review of the ALJ's decision.

## LEGAL STANDARD

### I.     Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with

substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted) (internal quotation marks omitted). Although the Court reviews the entire record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But the Court may require reversal and remand the matter if the ALJ committed an error of law or the decision is based on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). "[H]e need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II.    Disability Standard

To qualify for DIB or SSI, a claimant must show that she is disabled, i.e. that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the Social Security Administration uses a five-step sequential analysis. 20

C.F.R. § 404.1520; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment(s) meet or equal a listed impairment in the Social Security regulations, precluding substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairment(s) meet or medically equal a listed impairment, the ALJ considers the individual disabled; if the claimant's impairment not rise to meet or equal a listed impairment, the analysis continues to step four. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ assesses the claimant's RFC and ability to engage in past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can engage in past relevant work, she is not disabled. *Id.* If she cannot, the ALJ proceeds to step five, in which the ALJ determines whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). An individual is not disabled if she can engage in other work. *Id.* The claimant bears the burden of proof on steps one through four, while the burden shifts to the government at the fifth step. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

In seeking to overturn the ALJ's decision, McCulley argues that (1) the ALJ failed to properly accommodate her mental limitations, (2) the ALJ's credibility determination is insufficiently supported, (3) the ALJ failed to properly consider her hand limitations, and (4) the ALJ did not properly support the sit and stand option in his RFC assessment. The Court addresses each of these contentions in turn.

10

## I.    Mental Limitations

McCulley first argues that the ALJ failed to properly accommodate her mental limitations in his RFC finding.  She argues that because the ALJ explicitly found that she had a mild limitation in concentration, persistence, or pace as a result of her depression at step two, the law required the ALJ to consider this limitation and accommodate it in his RFC finding at step four.

The Commissioner concedes that "[a]t step two of the sequential analysis, the ALJ properly applied [the Social Security Administration's] special technique for evaluating mental impairments."  Doc. 35 at 5.  Thus, the Court takes the ALJ's analysis at step two as established and addresses only the ALJ's alleged error in the RFC analysis at step four.  *See Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them.").

When determining a claimant's RFC, an ALJ must consider all medically determinable impairments, including those that are not severe.  *Craft*, 539 F.3d at 676.  An ALJ must also consider all the effects and limitations resulting from those impairments.  *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) ("When determining an individual's RFC, the ALJ must consider all limitations that arise from medically determinable impairments."); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("An ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").

Moreover, even though the "special technique" used at step two is not an RFC finding, SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996), if an ALJ finds mental impairments at step two, these should then be "reflected as limitations in the RFC finding."  *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011); *see also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) ("As a general rule, . . . the ALJ's RFC assessment must incorporate all of the claimant's

limitations supported by the medical record. This includes any deficiencies the claimant may have in concentration, persistence, or pace." (citations omitted)); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (ALJ erred in not including mild mental limitations he found at step two in his RFC analysis); *Verlee v. Astrue*, No. 1:12-CV-45-TLS-RBC, 2013 WL 1760810, at *8–9 (N.D. Ind. Apr. 24, 2013) ("On remand, the ALJ should explicitly discuss the Plaintiff's mild restrictions with regard to . . . concentration, persistence or pace in his RFC assessment and analyze their impact on the Plaintiff's ability to engage in substantial gainful activity.").

Here, in applying the "special technique" at step two to determine the severity of McCulley's depression, the ALJ explicitly found a mild limitation in McCulley's concentration, persistence, or pace. AR 15. Yet, when he made the RFC assessment at step four, the ALJ made no mention of this limitation. The ALJ's failure to discuss and incorporate this mild limitation in his RFC analysis and to determine what impact it had on McCulley's ability to perform her previous relevant work is grounds for remand. *See Alesia*, 789 F. Supp. 2d at 934.

The Commissioner's reliance on *Sawyer v. Colvin*, 512 F. App'x 603 (7th Cir. 2013), and *Griffeth v. Commissioner of Social Security*, 217 F. App'x 425 (6th Cir. 2007), is misplaced. In *Sawyer*, the Seventh Circuit found that the ALJ did not err in finding that the claimant, who suffered from moderate mental limitations, was capable of performing unskilled jobs. 512 F. App'x at 610. In that case, however, the court found that the ALJ appropriately incorporated the claimant's mental impairments into the RFC determination. *Id*. Likewise, in *Griffeth*, the ALJ explicitly discussed the claimant's mild limitations in his RFC finding before concluding that they were no obstacle to the claimant's ability to return to his past relevant work. 217 F. App'x at 428. That is not the case here, where the ALJ did not set out a reasoned analysis for why he

found McCulley capable of returning to her previous work despite her mild limitation in concentration, persistence, or pace. *See Alesia*, 789 F. Supp. 2d at 934.

Although McCulley's mild limitation may not have required accommodation, as the Commissioner argues, the ALJ was at least required to explain why that is the case. Even if the ALJ here ultimately discounted McCulley's mild limitation or found it did not prevent her from working, because he provided no discussion whatsoever of McCulley's mild limitation in relation to her ability to return to her past relevant work, the Court cannot determine whether that was, in fact, the case. The ALJ failed to "articulate, at least minimally, his analysis of the evidence so that th[e] court can follow his reasoning." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). That the ALJ discussed and discounted McCulley's testimony as to the limiting effects of her *depression as such* in his RFC finding does not excuse him from specifically addressing the particular limitation he himself found at step two. *See Thomas*, 745 F.3d at 807 ("When determining an individual's RFC, the ALJ must consider *all* limitations that arise from medically determinable impairments." (emphasis added)). Therefore, upon remand, the ALJ should explicitly discuss the impact that McCulley's mild limitation in concentration, persistence, or pace has on her ability to return to her previous relevant work.

## II.    Credibility Determination

McCulley also argues that the ALJ did not properly evaluate her credibility as required by Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[2] Specifically, she contends that

---

[2] The Social Security Administration rescinded SSR 96-7p and issued SSR 16-3p on March 16, 2016, eliminating the use of the term "credibility" from the symptom evaluation process. SSR 16-3p, 2016 WL 1119029, at *1. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). More importantly to the consideration of this case, SSR 96-7p continues to govern; SSR 16-3p applies only to ALJ determinations made on or after March 28, 2016 and the ALJ issued his decision on May 25,

(1) the ALJ failed to set out which statements were credible and which were not, (2) he inappropriately relied on his perception of her treatment history, (3) he inappropriately relied on the lack of specific diagnoses for some of her problems, (4) he failed to consider all the factors he was required to under Social Security Ruling 96-7p, and (5) he drew a negative inference from gaps in her treatment without considering possible explanations.

Once an ALJ finds "underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's pain," he must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms." SSR 96-7p, 1996 WL 374186, at *2. In doing so, he must assess the credibility of a claimant's statements about pain and other symptoms. *Id.* When these statements are not substantiated by objective medical evidence, the ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *2, 4. The ALJ may not disregard "allegations concerning the intensity and persistence of pain or other symptoms . . . solely because they are not substantiated by objective medical evidence." *Id.* at *6. But "[a] report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility." *Id.* The ALJ must justify his credibility finding with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build "an 'accurate and logical bridge' between the evidence and the conclusion." *Craft*, 539 F.3d at 673; *see also Shideler*, 688 F.3d at 311; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); SSR 96-7p, 1996 WL 374186, at *4.

---

2012. *See* Notice of Social Security Ruling (SSR), 82 F.R. 49462-03, 2017 WL 4790249, at 49468 n.27 (Oct. 25, 2017).

A credibility finding is entitled to substantial deference from a reviewing court and will be overturned only if "patently wrong," *Pepper*, 712 F.3d at 367 (quoting *Craft*, 539 F.3d at 678), or if the trier of fact "grounds his credibility finding in an observation or argument that is unreasonable or unsupported," *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). A decision is "patently wrong" "when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

McCulley first argues that the ALJ's credibility finding is flawed because he failed to set out which statements he found credible and which he did not. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (criticizing ALJ for his "perfunctory" credibility analysis). But McCulley is asking for more than is required, as the Seventh Circuit has specifically noted that "an ALJ's credibility findings need not specify which statements were not credible." *Shideler*, 688 F.3d at 312. In contrast to *Martinez*, the ALJ here examined a considerable amount of medical and other evidence in determining McCulley's credibility, including the opinions of three consulting physicians. This discussion provides adequate support for the ALJ's credibility finding, and so McCulley's complaint that the ALJ did not specifically identify which statements were not credible "does not demonstrate that the ALJ's credibility finding is not supported by substantial evidence." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

Second, McCulley argues that the ALJ erred by relying on his perceptions of her treatment level as "generally conservative," AR 17, without citing to evidence of what would be appropriate treatment for her condition. Instead, the ALJ discounted McCulley's complaints of pain because there had "been no therapy or strong pain medication prescribed." AR 20. An ALJ may not "play doctor" or reach his own independent medical conclusion without support from the medical evidence. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *see also Thomas*, 745

F.3d at 806. It is true that the Seventh Circuit has recognized that physical therapy and epidural injections may be characterized as "conservative." *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014). *But see Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (noting that steroid injections belied ALJ's conclusion that claimant was being treated conservatively). But no doctor characterized McCulley's treatment as conservative and there was no evidence of what treatment options were available for her conditions. *See Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *7 (N.D. Ill. Apr. 16, 2014) (improper to discount claimant's credibility based on a lack of an attempt to seek certain treatment where there is no evidence that such treatment was recommended or would have been effective); *Wenzel v. Colvin*, No. 2:13-CV-433-JEM, 2015 WL 880581, at *7 (N.D. Ind. Feb. 27, 2015) ("The ALJ may 'consider conservative treatment in assessing the severity of a condition,' but should cite medical evidence about what kind of treatment would be appropriate." (quoting *Brown v. Barnhart*, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004))). Thus, the ALJ inappropriately characterized her treatment as "conservative" without a basis in the medical evidence or consideration of whether McCulley's symptoms called for more aggressive treatment. *See Thomas v. Colvin*, No. 13 C 3686, 2015 WL 515240, at *4 (N.D. Ill. Feb. 6, 2015) ("Merely characterizing treatment as 'conservative' fails to consider whether options would have been available and appropriate for Thomas' myriad impairments."). Because the ALJ did not consider whether alternative treatment options existed, the negative inference he drew from McCulley's alleged conservative treatment lacks adequate support, for "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist." *Id.* (quoting *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)); *Grippo v. Colvin*, No. 12 CV 6016, 2014 WL 627110, at *10 (N.D. Ill. Feb. 18, 2014) (finding ALJ's reasons for discounting claimant's credibility lacked adequate support where ALJ did not

explain why treatment with pain medication was a conservative course of treatment nor acknowledge physician's opinion suggesting lack of treatment options); *Buechele v. Colvin*, No 11 C 4348, 2013 WL 1200611, at *17 (N.D. Ill. Mar. 25, 2013) (criticizing ALJ for discounting claimant's credibility based on receipt of conservative treatment where "there is no evidence that more aggressive treatment was indicated for Claimant's condition). On remand, the ALJ should analyze McCulley's conditions and treatment history in line with the medical record and without making his own independent medical findings.

Third, McCulley argues that the ALJ erred in finding that the lack of specific diagnoses undermined her credibility. "An ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results." *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014). But an ALJ is not precluded from considering a lack of specific diagnoses; rather, he cannot base his credibility finding *solely* on a lack of "significant physical and diagnostic examination results." *Id.* at 1050. As SSR 96-7p makes clear, diagnoses are a factor to be used in evaluating a claimant's credibility. SSR 96-7p, 1996 WL 374186, at *5 (the evidence to be considered "includes . . . [d]iagnosis"). Here, the ALJ did not rely solely on the lack of a diagnosis or physical and diagnostic examination results; he pointed to other evidence to support his finding, including the inconsistency between her testimony and what she reported to her doctors. *Cf.* SSR 96-7p, 1996 WL 374186, at *5 ("The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances . . . . Especially important are statements made to treating . . . medical sources[.]"). The Court thus finds that the ALJ did not err in considering the lack of a diagnosis as a factor in his credibility finding.

Fourth, McCulley argues that the ALJ erred in finding her testimony incredible without specifically assessing all the factors contained in SSR 96-7p. Specifically, she contends that the ALJ failed to consider both her long work record and Dr. Carlton's statement that she "appeared to be a reliable historian." AR 312. According to SSR 96-7p:

> Assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: . . . [s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

SSR 96-7p, 1996 WL 374186, at *5. The ALJ is instructed to "evaluate all of this information and draw appropriate inferences and conclusions about the credibility of the individual's statements." *Id.* But an ALJ need not recount every piece of evidence in his opinion in order for the Court to find his decision adequate. *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) ("[A]n ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" (quoting *Schmidt*, 395 F.3d at 744)); *Skarbek*, 390 F.3d at 504–05 (providing specific reasons for a credibility finding is sufficient for compliance with SSR 96-7p). The fact that the ALJ did not mention these pieces of information does not necessarily mean that he did not consider them. *See Kessler v. Colvin*, No. 1:14-CV-152-JVB-SLC, 2015 WL 4133068, at *2 (N.D. Ind. July 7, 2015); *Stark v. Colvin*, No. 1:14-CV-108-JVB-SLC, 2015 WL 1780066, at *2 (N.D. Ind. Apr. 17, 2015) (ALJ "was not required to single out Plaintiff's work history as a substantial factor in favor of her credibility" and so the failure to do so was not reversible error). But because the case is being remanded for a reevaluation of McCulley's RFC, the ALJ should more clearly articulate his reasoning so as to demonstrate how

McCulley's work history contributes to the credibility assessment. *See Springer v. Colvin*, No. 1:13CV185, 2014 WL 3075342, at *8 (N.D. Ind. July 2, 2014) (because case was being remanded, court would further remand "for a more accurate credibility determination" to consider claimant's work history).

Finally, the ALJ erred by drawing a negative inference from gaps in McCulley's treatment. Even though a claimant's statements "may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed," SSR 96-7p, 1996 WL 374186, at *7, "such evidence should not negatively affect an individual's credibility if there are good reasons for the failure," *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *see also Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("[T]he ALJ must not draw any inferences . . . from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." (citation omitted) (internal quotation marks omitted)); *Myles*, 582 F.3d at 677 ("[T]he ALJ was required . . . to consider explanations for instances where [the claimant] did not keep up with her treatment[.]"). In *Murphy*, for example, the Seventh Circuit found it could not assess the validity of the ALJ's credibility determination where the ALJ did not ask the claimant why she did not comply with her prescribed treatment, noting that there may be a reasonable explanation, such as that she could not afford treatment, it may have been ineffective, or it created intolerable side effects. 759 F.3d at 816; *see also Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013) ("[A]n administrative law judge is not allowed to infer from an applicant's failure to have sought medical care that he's a malingerer without asking him *why* he didn't seek care—and specifically whether he had health insurance. Persons who don't have health insurance often delay in seeking medical care even for serious conditions." (citations omitted)); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment

or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").  Similarly, here, the Court is unable to assess the validity of the ALJ's credibility determination where the ALJ did not explore McCulley's reasons for the lack of medical care for her back, leg, ankle, and hand pain, instead drawing the inference that that pain was not as severe as McCulley contended.  Although this singular error may not be enough on its own to undermine the ALJ's credibility assessment, *see McKinzey*, 641 F.3d at 890–91 (failure to consider a claimant's explanations for not following recommended treatment is not necessarily fatal, provided substantial evidence supports the ALJ's credibility finding), taken with the other problems in the ALJ's credibility assessment identified above, the Court finds that remand is also required for the ALJ to reconsider the credibility determination.

## III.    Hand Limitations

In a related argument, the Court must consider McCulley's contention that the ALJ erred at step four in discounting her testimony that she was unable to use her hands when he determined her RFC.  The Commissioner contends that the Court should not even reach this issue because the ALJ found no underlying medically determinable hand impairment at step two and so the ALJ need not have included or even discussed any hand limitations in the RFC.

### A.    The Commissioner's Step Two Argument

The Commissioner contends that McCulley's argument on this issue is predicated on the misguided assumption that the ALJ found her to have a medically determinable hand impairment.  The Commissioner argues that because the ALJ neither found such an impairment nor otherwise addressed McCulley's alleged hand limitations at step two, he could not err at step four by discounting McCulley's testimony about her hand limitations.  *See* 20 C.F.R.

§ 404.1529(b) ("Your symptoms, such as pain . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."); SSR 96-7p, 1996 WL 374186, at *2 (same).

But McCulley's challenge to the ALJ's credibility determination does not depend on a finding of a medically determinable *hand* impairment at step two. Rather, she points to the ALJ's statement at step four that her previously enumerated "medically determinable impairments could reasonably be expected to cause the alleged symptoms," symptoms which, as she reads the ALJ's opinion, include the "pain, cramping, and spasms in her hands." AR 17. Though the ALJ's statement comes in the context of language that is often criticized as "meaningless boilerplate," *see, e.g.*, *Pepper*, 712 F.3d at 367, and though it fails to explicitly state exactly which "alleged symptoms" could reasonably be caused by her medically determinable impairments, it appears that the ALJ meant to include her hand pain. Indeed, the ALJ extensively discussed the hand limitations in his step four analysis. *See* AR 17, 19–20. The discussion of her hand pain would only be necessary at step four if it was caused by one of the impairments found at an earlier stage. *See* 20 C.F.R. § 404.1529(b).

But the Commissioner correctly points out that the ALJ did not specify which medically determinable impairment caused McCulley's hand pain. The Commissioner argues that it could not have been caused by any of the impairments identified and that instead the analysis at step four should be read as a step two analysis. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five, we consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five." (citation omitted)). But this cannot be done here, where the

ALJ's analysis of McCulley's hand pain at step four is not for the purpose of determining whether she suffers from a severe or non-severe medically determinable impairment but rather to determine whether her pain affects her ability to perform her job. This is not a "substantially similar factual analys[i]s." *Rice*, 384 F.3d at 370 n.5. The Commissioner's argument that the ALJ's discussion of McCulley's hand pain is not connected to a medically determinable impairment at step four would instead appear to be cause for further remand, as under that interpretation, the ALJ either improperly considered McCulley's testimony on this point, 20 C.F.R. § 404.1529(b), or did not properly articulate the connection, preventing meaningful review, *Kastner*, 697 F.3d at 646 (remand required where decision is poorly articulated so as to "prevent meaningful review."). Alternatively, accepting that McCulley's hand pain was caused by one of the medically determinable impairments identified by the ALJ, *see Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[W]hat matters are the reasons articulated *by the ALJ*."), the Court will proceed to consider whether the ALJ failed to properly assess McCulley's testimony concerning her hand limitations at step four.

### B. The ALJ's Credibility Finding

The ALJ found at step four that McCulley's statements concerning the "intensity, persistence and limiting effects" of her symptoms were "not entirely credible," AR 17, and that the evidence in the record did "not support her claims of severe manual deficits," AR 20. He concluded that "[t]here is no significant and credible evidence in the record to support further reducing the claimant's residual functional capacity." AR 20.

In finding that McCulley's statements concerning the severity of her hand pain were incredible, the ALJ relied on four grounds: (1) McCulley's hand x-rays were normal; (2) despite McCulley's claims that she had been experiencing pain in her hands for years, she first reported

such pain to a doctor in July 2011 and afterward complained of hand pain only on a limited number of occasions; (3) she took ibuprofen only when "absolutely necessary" and did not request further pain medication or therapy; and (4) Dr. Carlton found that McCulley had normal grip strength bilaterally and that her fine and gross motor skills in both hands were normal. AR 20. McCulley contends that the ALJ's reasons lack factual and legal support, with the ALJ inappropriately playing doctor, failing to explore possible legitimate explanations for McCulley's complaint and treatment levels as required by Social Security Administration regulations, and drawing an unwarranted and unsupported inference from Dr. Carlton's examination.

### 1. Playing Doctor

As noted above, an ALJ may not "play doctor" by drawing his own conclusions as to the meaning and significance of medical findings. *Myles*, 582 F.3d at 677; *see also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (describing "playing doctor" as "a clear no-no"); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."); *Engstrand v. Colvin*, --- F.3d ----, 2015 WL 3505585, at *4 (7th Cir. June 4, 2015) (ALJ played doctor by inappropriately assuming a connection between negative test results and claimant's pain level despite lack of physicians' findings to that effect). McCulley first argues that the ALJ played doctor when he pointed to the bilateral hand x-rays and to her level of treatment when making his credibility determination. She accuses the ALJ of making x-rays a "litmus test of hand limitations" and of "misunderstanding . . . medical evidence," Doc. 26 at 9, and argues that he inappropriately relied on his own views of appropriate treatment in drawing conclusions about her level of treatment.

The x-rays in this case came back "normal" and indicated that McCulley had "no fractures or dislocations" and "[n]o significant joint or soft tissue abnormalities." AR 341. But there is little to no evidence in the record from any physician as to the significance of those results. This situation is closely analogous to *Engstrand*, where the ALJ received criticism for drawing his own conclusion that negative test results were inconsistent with the claimant's reports of pain absent expert medical opinions. 2015 WL 3505585, at *4 ("[I]n deciding that [the claimant's ability to feel a monofilament and his complaints of pain] were mutually exclusive, the ALJ was inappropriately 'playing doctor.'"). Though Dr. Barberousse made no mention of the Nov. 22, 2011 x-ray results in his Dec. 9, 2011 treatment notes, on February 27, 2012, he referred McCulley to a musculoskeletal clinic for further evaluation of her hand complaints. AR 359. And McCulley also testified at the April 18, 2012 administrative hearing that Dr. Barberousse was continuing to address the problem. AR 50 ("He sees it's an ongoing thing to try to figure out what's causing it."). This at least suggests that the normal hand x-rays did not completely undermine McCulley's complaints of pain.

That the ALJ gave no weight to Dr. Barberousse's opinion and thus was left with no other physician's findings with regard to the x-ray results does not excuse him from needing to "rely on expert opinions instead of determining the significance of particular medical findings [himself]." *Moon*, 763 F.3d at 722. As "the ALJ has a duty to develop a full and fair record," *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000), if he found Dr. Barberousse's opinion insufficient, the ALJ should have sought out additional medical opinions on the significance of the x-rays rather than substituting in his own assessment and interpretation of the results. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) (if ALJ finds evidence that claimant produces

of her impairments to be insufficient, it is the ALJ's "responsibility to recognize the need for additional medical evaluations").

Just as he is not permitted to "play doctor" by independently interpreting medical findings, an ALJ is also not permitted to make his own inferences, unsupported by the record, as to the significance of a claimant's treatment for the severity of her symptoms. *See Myles*, 582 F.3d at 677–78 ("The ALJ impermissibly 'played doctor' and reached his own independent medical conclusion when he determined that 'the level of treatment received . . . fails to infer limitations beyond the limitations described above in this decision.'"). In this case, the ALJ noted that McCulley was only taking ibuprofen when "absolutely necessary" for her hand pain and that if she were actually in as much pain as reported "one would assume she would have requested further pain medication and/or therapy." AR 20. But the ALJ cited no evidence from any physician as to what level of treatment would have been appropriate for McCulley's hand pain and which her actual treatment did not meet. He merely made an assumption about what he thought her treatment level should have been and then drew his own conclusion based on a comparison between that assumption and reality. As discussed above, this was improper. *See Thomas*, 2015 WL 515240, at *4; *Buechele v. Colvin*, No 11 C 4348, 2013 WL 1200611, at *17. The Court therefore finds that the ALJ erred by "playing doctor" in basing his credibility finding in part on his own interpretation of the x-ray results and his own assumptions as to the significance of McCulley's treatment history for her hand pain.

## 2. Limited Treatment of Hand Pain

McCulley also argues that the ALJ erred in discounting her hand limitations based on her failure to complain to or seek treatment from her doctors and on her failure to comply with the treatment they did recommend. A claimant's statements about pain may be less credible when the evidence in the record reveals a failure to seek or pursue regular medical treatment. SSR 96-

7p, 1996 WL 374186, at *7.  McCulley, however, claims that her hand pain only occurs after 15 to 20 minutes of "continuous" use, AR 213, and that she did not seek regular medical treatment because she had structured her daily activities to limit and avoid the pain, AR 55.  She argues that an ALJ is precluded from "penalizing" her "for structuring her daily routine to minimize symptoms" or for "limit[ing] her activity to avoid pain and spen[ding] most of her day resting." Doc. 25 at 9.

Indeed, the ALJ may not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," including the fact that the individual has structured her daily activities "so as to minimize symptoms to a tolerable level or eliminate them entirely."  SSR 96-7p, 1996 WL 374186, at *7–8.  But an ALJ may still find an individual's statements "less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . *and there are no good reasons for this failure*."  *Id.* at *7 (emphasis added).

Here, the problem is not that the ALJ made a negative inference about McCulley's hand limitations based on her failure to complain or seek treatment but rather that he failed to consider her possible reasons for not complaining or seeking treatment before drawing that inference.  *See Garcia*, 741 F.3d at 761 ("[A]n administrative law judge is not allowed to infer from an applicant's failure to have sought medical care that he's a malingerer without asking him *why* he didn't seek care."); *Moss*, 555 F.3d at 562 (criticizing ALJ for failing to question claimant about treatment gap).  He did not ask McCulley why she did not complain to her doctor more often about her hand pain or why she only took ibuprofen on an infrequent basis even though she was

reportedly in excruciating pain. The ALJ therefore erred in not inquiring after and considering possible explanations for McCulley's failure to pursue more extensive treatment for her hand issues. *See Murphy*, 759 F.3d at 816 (court could not "assess the validity of the ALJ's credibility determination because the ALJ did not ask important questions to determine if [the claimant's] actions were justifiable"); *Craft*, 539 F.3d at 679 ("[T]he ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." (quoting SSR 96-7p)).

### 3.  Dr. Carlton's Examination Findings

Finally, McCulley argues that the ALJ inappropriately relied on Dr. Carlton's examination results, which found that she had "normal grip strength bilaterally and that her fine and gross motor skills . . . were normal." AR 20. She contends that because her hand pain allegedly occurs only after 15 to 20 minutes of continuous use, AR 213, and because Dr. Carlton's examination lasted only a half hour (including the time it took to obtain her medical history), AR 312, the examination did not test the specific ability she claims is impaired. As a result, McCulley argues, Dr. Carlton's findings do not undermine her claims of hand impairment. *See Craft*, 539 F.3d at 673 (ALJ must build an "'accurate and logical bridge' between the evidence and the conclusion").

McCulley relies on *Scott*, in which the ALJ cited a medical examination to support the RFC finding that the claimant could stand for 6 hours during a regular day and lift 10 to 20 pounds. 647 F.3d at 740. The examination, however, did not test these abilities, and the court found that the ALJ's conclusion was therefore unexplained and unsupported by the medical examination. *Id.* Likewise, in *Garcia*, the court noted that though a medical examination had indicated that the claimant's musculoskeletal structure was not impaired, that examination did

not explore "what things he could lift, how large, how heavy, *for how long*." 741 F.3d at 762 (emphasis added).

In much the same way, the ALJ here pointed to a brief examination of McCulley's hands with normal results to support the broad proposition that her claims of disabling pain in her hands after 15 to 20 minutes of continuous use are incredible. But Dr. Carlton's examination did not specifically test the abilities McCulley alleged were impaired. *See Scott*, 647 F.3d at 740. Moreover, like in *Garcia*, because Dr. Carlton's examination did not explore *how long* McCulley could maintain normal grip strength and normal fine and gross motor skills in her hands, it does not directly support the ALJ's conclusion that she needed no accommodation for her hand pain. *See Garcia*, 741 F.3d at 762. Dr. Carlton's examination therefore does not necessarily undermine or discredit McCulley's claims of disabling hand pain after 15 to 20 minutes of continuous use of her hands, and it does not provide the support needed to build a logical bridge to the conclusion that McCulley did not have manual limitations so that they did not have to be incorporated into the RFC.

Because the ALJ failed to adequately explain his credibility finding with regard to McCulley's alleged hand limitations and failed to support it with substantial evidence in the record, remand is required on this basis as well.

## IV.    Sit/Stand Option in RFC Assessment

Finally, McCulley challenges the ALJ's finding that she has the RFC to perform sedentary work if she is given a "sit/stand option that permits her to alternate into a standing position once an hour for 5 minutes." AR 16. She argues that there was no basis in the record for finding that such an option properly accommodated her limitations.

An ALJ must explain how he reaches his conclusion about the residual functional capacity of a claimant and support that conclusion with evidence from the record. *See, e.g.*, SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]"); *Scott*, 647 F.3d at 740 ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities[.]"); *Eakin v. Astrue*, 432 F. App'x 607, 611 (7th Cir. 2011) ("The RFC determination should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion.").

Here, the ALJ adequately explained and supported his RFC determination and the included sit/stand option. He first relied on the opinions of Drs. Carlton, Gotway, and Kenney in establishing that the record did not necessarily support a sit/stand option. *See Scott*, 647 F.3d at 740 (ALJ must "identify . . . medical evidence to substantiate her belief"); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (noting that the ALJ must explain how he arrived at his conclusions, "citing specific medical facts"). Dr. Barberousse disagreed with this assessment, but the ALJ considered his opinion "to be unreasonably restrictive and out of proportion to the medical evidence of record." AR 19. McCulley does not challenge the weight the ALJ gave to Dr. Barberousse's opinion, and thus the Court need not consider whether the ALJ's finding that the record did not support a sit/stand option is unreasonable based on Dr. Barberousse's contrary opinion.

Notwithstanding the record evidence, the ALJ exercised his discretion and found McCulley's testimony that she needed to alternate positions to relieve pain credible to a certain degree, softening the assessments of the physicians on whose opinions he relied. *See* SSR 96-7p, 1996 WL 374186, at *4 (ALJ "may . . . find an individual's statements, such as statements about

the extent of functional limitations or restrictions due to pain or other symptoms, to be credible *to a certain degree*" (emphasis added)); *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (ALJ does not err "by electing to temper" physician's opinion "for the claimant's benefit"). That McCulley wishes the ALJ had given more credence to her testimony does not amount to reversible error, particularly where the ALJ explained his reasons for not crediting all her complaints, nor does it imply that the ALJ's RFC determination was without support in the record, where there is no medical evidence for greater limitations than those found by the ALJ. *See Swaiss v. Colvin*, No. 13 C 8143, 2015 WL 231473, at *8 (N.D. Ill. Jan. 16, 2015); *Cockream v. Colvin*, No. 13 C 6483, 2014 WL 7011377, at *8 (N.D. Ill. Dec. 10, 2014).

The cases McCulley cites to support her argument that the ALJ failed to lay out a supported explanation for the sit/stand finding are inapposite. In each of them, the ALJ found the claimant to be capable of *more* than the medical evidence suggested. *See, e.g.*, *Garcia*, 741 F.3d at 762; *Scott*, 647 F.3d at 740; *Briscoe*, 425 F.3d at 352–53; *Eakin*, 432 F. App'x at 611. By contrast, McCulley asks the Court to reverse the ALJ's assessment because he found her capable of *less* than the medical evidence suggested. That is not something courts have mandated. *See Swaiss*, 2015 WL 231473, at *8.

Finally, citing *Moore v. Colvin*, 743 F.3d 1118, 1128 (7th Cir. 2014), McCulley argues that because of the ALJ's alleged inadequate explanation for the sit/stand option, this Court is left only to speculate as to its basis, thus rendering the finding arbitrary and unreviewable. This argument also fails. As *Chapo* observed, an adverse medical opinion can be "moderated favorably" even if the ALJ does not provide an "explanation for extending the claimant such a benefit." 682 F.3d at 1288. Regardless, the ALJ did not leave this Court to speculate as to the basis of the sit/stand option. Unlike in *Moore*, where the ALJ failed to link the claimant's RFC

limitations to any specific impairments, 743 F.3d at 1127–28, the ALJ here clearly grounded his sit/stand finding in McCulley's testimony that her pain required her to alternate positions periodically—to the degree that he found that testimony credible. Therefore, the ALJ did not commit reversible error in tempering the medical opinions in McCulley's favor and including a sit/stand limitation in his RFC finding.

## CONCLUSION

For the foregoing reasons, the Court grants McCulley's motion for summary judgment [26] and denies the Commissioner's motion for summary judgment [34]. The Court reverses the ALJ's decision and remands this case to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion.

Dated: March 20, 2019

_____
SARA L. ELLIS
United States District Judge